E-FILED
Tuesday, 08 January, 2013  09:43:30 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Olajide Giwa, )
             Plaintiff )
 )
             v )     Case No. 09-1306
 )
City of Peoria, Illinois et al )
             Defendant )

OPINION and ORDER

Now before the Court is the Defendant's Motion for Summary Judgment (#43). The motion is fully briefed and I have carefully considered the arguments and evidence presented by the parties. As explained herein, the motion is granted.

I SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial*." Matsushita Electric Industrial Co., Ltd. v Zenith Radio Corp.*, 475 US 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See *Jay v Intermet Wagner Inc.*, 233 F3d 1014, 1016 (7th Cir 2000); Cox v Acme Health Services, 55 F3d 1304, 1308 (7th Cir 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. *Anderson v Liberty Lobby, Inc.,* 477 US 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. *Waldridge v American Hoechst Corp.*, 24 F3d 918, 922 (7th Cir 1994). The court has one task and one task

only: to decide based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, *Erdman v City of Fort Atkinson*, 84 F3d 960, 961 (7th Cir 1996); *Vukadinovich v Board of School Trustees*, 978 F2d 403, 408 (7th Cir 1992), *cert. denied*, 510 US 844 (1993); *Lohorn v Michal*, 913 F2d 327, 331 (7th Cir 1990); *DeValk Lincoln-Mercury, Inc. v Ford Motor Co*., 811 F2d 326, 329 (7th Cir 1987); *Bartman v Allis Chalmers Corp*., 799 F2d 311, 312 (7th Cir 1986), *cert. denied*, 479 US 1092 (1987), and construing any doubts against the moving party. *Adickes v S.H. Kress & Co.,* 398 US 144 (1970); Trotter v Anderson, 417 F2d 1191 (7th Cir 1969); *Haefling v United Parcel Services, Inc*., 169 F3d 494, 497 (7th Cir 1999).

In considering a motion for summary judgment, however, there is one occasion when the court is not obligated to accept as true the non-movant's version of facts: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v Harris*, 550 US 372, 380 (2007).

Neither the moving party nor the responding party may simply rest on allegations; those allegations must be supported by significant probative evidence. *First National Bank of Arizona v Cities Services Co*., 391 US 253, 290 (1968). See also *Matsushita Electric Industrial Co. v Zenith Radio Corp.*, 475 US 574, 586 (1986)(when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts). Instead, the parties must identify the evidence that will facilitate the court's assessment. *Waldridge*, 24

F3d at 922. Thus, as FRCP 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of the complaint. Rather:

[T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See, *Celotex Corp. v Catrett*, 477 US 317, 323 (1986). See also, Local Rule CDIL 7.1(D).

A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 US at 250.

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. *Hedberg v Indiana Bell Telephone Co*., 47 F3d 928, 931 (7th Cir 1995), citing *Anderson*, 477 US at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. *Celotex*, 477 US at 322; *Waldridge*, 24 F3d at 920.

As the Seventh Circuit has explained, "[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions." *Herman v City of Chicago*, 870 F2d 400, 404 (7th Cir 1989). See also, *Bell, Boyd & Lloyd v Tapy*, 896 F2d 1101, 1103-04 (7th Cir 1990); *L.S. Heath & Son, Inc. v AT & T Information Systems, Inc*., 9 F3d 561, 567 (7th Cir 1993). The Local Rules of this Court specify the form, content and timing for all motions for summary judgment and responses and replies thereto. See, Local Rule CDIL 7.1(D).

## II LAW OF TITLE VII

Under Title VII it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 USC § 2000e-2. Title VII prohibits only discrimination based on protected status; it does not prohibit discrimination based on personality conflicts or other non-protected bases. See, for example, *Jajeh v County of Cook*, 678 F3d 560, 569 (7th Cir 2012), citing *Oncale v Sundowner Offshore Services, Inc.*, 523 US 75, 80 (1998).

In order to survive a motion for summary judgment in a disparate treatment claim, a plaintiff must produce some evidence that (1) intentional discrimination (2) was more likely than not (3) the motivation (4) behind the challenged employment decision. *St. Mary's Honor Center v Hicks*, 509 US 502 (1993).

A plaintiff may prove disparate treatment under Title VII by using either the direct method or the indirect method of proof. *Rhodes v Illinois Department of Transp*ortation, 359 F3d 498, 504 (7th Cir 2004). The direct method of proof permits a plaintiff to show - by either direct or circumstantial evidence - that his employer's decision to take an adverse job action against him was motivated by a prohibited purpose, such as race or national origin. Id.

If a plaintiff cannot prevail under the direct method of proof, he must proceed using the burden-shifting analytical framework articulated in *McDonnell Douglas Corp. v Green*, 411 US 792 (1973). See, Adams v Wal-Mart Stores Inc., 324 F3d 935 (7th Cir 2003). Under that framework, the plaintiff must first establish a prima facie case of discrimination, which creates a rebuttable presumption of discrimination. The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. Upon articulation of such a

4

reason, the presumption of discrimination vanishes, and the plaintiff must prove that the stated reason was merely pretext for discrimination. See, for example, *Texas Department of Community Affairs v Burdine*, 450 US 248, 253-56 (1981). Actually, at this third stage, the plaintiff's burden under this shifting burden analysis "merges with the ultimate burden of persuading the court that []he has been the victim of intentional discrimination." Id. at 256. In other words, plaintiff's burden returns the plaintiff to his original position, namely the position of proving intentional discrimination. *Hicks*, 509 US at 510; *Nawrot v CPC International*, 277 F3d 896, 905 (7th Cir 2002).

A prima facie case of discrimination requires evidence that (1) plaintiff was a member of the protected class; (2) plaintiff was qualified for the job in question or was meeting the employer's legitimate performance expectations; (3) plaintiff suffered an adverse employment action; and (4) the employer treated similarly situated persons not in a protected class more favorably. *Bragg v Navistar International Transportation Corp.,* 164 F3d 373, 376 (7th Cir 1998).

There is no dispute that Plaintiff is a member of a protected class. He is Nigerian and raises issues of disparate treatment on the basis of both race and national origin.

One element of the prima facie case is that the employee was satisfying the employer's legitimate performance expectations up until the time of his termination. *Jones v Union Pacific Railroad Co.*, 302 F3d 735,741 (7th Cir 2002). This includes adherence to employer's rules and regulations. Id.; cf. *Lim v Trustees of Indiana University*, 297 F3d 575, 581 (7th Cir 2002) (plaintiff failed to establish that she was meeting university's legitimate requirements regarding research and publishing); *Salvadori v Franklin School District*, 293 F3d 989, 996 (7th Cir 2002) (fact that plaintiff had received satisfactory performance evaluations for several years did not

satisfy this requirement in light of later, "less glowing" evaluations and failure to comply with performance improvement plan).

Not everything that makes an employee unhappy is actionable under Title VII. *Dass v Chicago Board of Education*, 675 F3d 1060, 1069 (7th Cir 2012); *O'Neal v City of Chicago*, 392 F3d 909, 911 (7th Cir 2004); *Drake v Minnesota Mining and MFG Co.,* 134 F3d 878, 885 (7th Cir 1998). To rise to the level of "adverse employment action," the plaintiff must show more than an inconvenience or alteration of job responsibilities. *Rhodes v Illinois Department of Transp*ortation, 359 F3d 498, 504 (7th Cir 2004); *Oest v Illinois Department of Corrections*, 240 F3d 605, 613 (7th Cir 2001). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v Liberty National Bank & Trust Co*., 993 F2d 132, 136 (7th Cir 1993); See also, *Cheek v Peabody Coal Co*., 97 F3d 200, 204 (7th Cir 1996); *Herrnreiter v Chicago Housing Auth*ority, 315 F3d 742, 744-45 (7th Cir 2002); *Lewis v Chicago*, 496 F3d 645 (7th Cir 2007).

To show the final element of the prima facie case, namely that similarly situated persons not in a protected class were treated more favorably, a plaintiff must address such factors as performance, qualifications and conduct, in addition to the identity of supervisors, the standards that govern job performance, and the similarity or differences in the conduct of these other employees. *Radue v Kimberly Clark Corp*., 219 F3d 612, 617-18 (7th Cir 2000). The Seventh Circuit has also made clear that there must be a balance between the employee's and the employer's evaluations of these comparator employees. The similarities and differences must be "sufficiently comparable" in "all material respects. " *Crawford v Indiana Harbor Co*., 461 F3d

6

844, 846 (7th Cir 2006). "[P]laintiff should have to show only that the members of the comparison group are sufficiently comparable to [him] to suggest that [] he was singled out for worse treatment." *Goodwin v Board of Trustees of University of Illinois*, 442 F3d 611, 619 (7th Cir 2006); *Ezell v Potter*, 400 F3d 1041, 1049-50 (7th Cir 2005). Otherwise, said the Court of appeals, plaintiffs will be in a box: if they pick just members of the comparison group who are comparable in every respect, they will be accused of cherry-picking; but if they look for a representative sample, they will unavoidably include some who were not comparable in every respect, but merely broadly comparable. *Crawford*, 461 F3d at 846.

Once a prima facie case is made out, the burden of production shifts to the employer, who must articulate a lawful reason for the employment action. Lawful means "facially legitimate", see *McDonnell Douglas*, 411 US at 804, quoted in *Zaccagnini v Chas. Levy Circulating Co*., 338 F3d 672, 676 (7th Cir 2003).

Once such a reason has been articulated, the burden shifts back to the plaintiff, who must show evidence of pretext. Pretext is more than a mistake or a decision based on erroneous facts; the reason must be shown to be a lie or a phony reason, or it must completely unsupported by facts. *Adreani v First Colonial Bankshares Corp*., 154 F3d 389, 395 (7th Cir 1998). *Russell v Acme Evans Co*., 51 F3d 64, 68 (7th Cir 1995); *Jordan v Summers*, 205 F3d 337, 343 (7th Cir 2000). To meet this burden, plaintiff must produce "significantly probative admissible evidence" from which it could be inferred that the employer's reason was false and that the actual reason was discriminatory. *Jones v Union Pacific Railroad Co*., 302 F3d 735 (7th Cir 2002); *King v Preferred Technical Group*, 166 F3d 887,892-93 (7th Cir 1999).

If the employer believed certain facts and believed that its employment action was proper in light of those facts, it matters not whether that version of the facts was correct. Id. The Court is

7

not to sit in review of the action as some sort of "super-personnel department" but rather only reviews the actions of the employer to ascertain whether the actions violated Title VII. *Stewart v Henderson*, 207 F3d 374, 378 (7th Cir 2000); *Nawrot v CPC International*, 277 F3d 896 (7th Cir 2002); *EEOC v Armstrong World Ind*ustries, 185 F. Supp. 2d 932, 937 (CD Ill 2002).

At the summary judgment stage, it is important to remember that Plaintiff need not prove her case. She must, however, introduce evidence of facts that support her claims, and these facts need to be more concrete than her impressions or feelings. "Facts, not an employee's perception and feelings, are required to support a discrimination claim." *Uhl v Zalk Josephs Fabricators, Inc.*, 121 F3d 1133, 1137 (7th Cir 1997).

Title VII also prohibits retaliation for exercising rights under the statute. Title VII's retaliation provision forbids any materially adverse action that would dissuade a reasonable employee from making a charge of discrimination even if the action does not affect the terms or conditions of employment. See, *Burlington Northern & Santa Fe Railway v White*, 548 US 53, 67–68 (2006); *Whittaker v Northern Illinois Univ*ersity, 424 F3d 640, 648 (7th Cir 2005) (explaining that the range of actionable adverse actions for retaliation claims under § 2000e–3 is broader than for discrimination claims under § 2000e–2); *Cain v Locke* , Case No. 10-2688, 2012 WL 1850928, *5, May 22, 2012(7th Cir).

As is true with disparate treatment claims, retaliation claims can be proven using either the direct or indirect methods of proof. Using the direct method to overcome summary judgment requires Plaintiff to show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the protected activity is causally related to the adverse employment action. *Arizanovska v Wal-Mart Stores, Inc*., 682 F3d 698, 703 (7th Cir 2012). To establish the third element—i.e., a causal relation—she must show that the protected

activity - such as filing an EEOC charge - was a "substantial motivating factor" in the employer's decision to take an adverse employment action. Id. at 704.

### III LAW OF ADEA

Under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

As is true in a Title VII case, in an age discrimination case, a plaintiff may show discrimination under either the direct or indirect methods of proof, *Brown v Illinois Department Natural Res*ources, 499 F3d 675, 681 (7th Cir 2007); *Luks v Baxter Healthcare Corp*., 467 F3d 1049 (7th Cir 2006).

To establish a prima facie case of age discrimination under the indirect method, a plaintiff must prove that (1) he is 40 or older; (2) his performance met the company's legitimate expectations; (3) despite his performance he was subject to an adverse employment action; and (4) the company treated similarly situated employees under 40 more favorably. *Martino v MCI Communications Services, Inc.*, 574 F3d 447 (7th Cir 2009), citing *Faas v Sears, Roebuck & Co.*, 532 F3d 633, 641 (7th Cir 2008). If plaintiff satisfies these criteria, the company may provide a legitimate, nondiscriminatory reason for the termination. Id. at 641-42. Assuming the company offers as much, plaintiff may challenge the stated reason as a pretext for discrimination. Id. at 642. Again, however, the ultimate burden to prove intentional discrimination always remains with plaintiff. *Greene v Potter*, 557 F3d 765, 769 (7th Cir 2009).

Even when an employer has proffered what appears to be a legitimate, nondiscriminatory explanation for its conduct in an age discrimination claim, summary judgment will not be

9

appropriate if the aggrieved employee produces evidence from which a jury reasonably could find that the stated explanation is false and that the real reason was discriminatory. *Duncan v Fleetwood*, 518 F3d 486 (7th Cir 2008).

## IV UNDISPUTED FACTS

Before beginning a recital of the facts in this case, several comments are necessary about Plaintiff's response to this motion. First, the Court is aware that he is proceeding pro se, and some latitude is given for that reason. But there are limits to that latitude, and in several significant ways, Plaintiff has stepped beyond those limits.

First, the Federal Rules of Civil Procedure require that opposition to facts asserted in summary judgment motions be supported by citation to "particular parts of materials in the record." FRCP 56(c)(1)(A). Rule 45(c)(3) states that the Court need only consider materials that are cited (although the Court is not prohibited from considering other materials). Similarly, the Rules of this Court require: "Each claim of disputed fact must be supported by evidentiary documentation referenced by specific page." CDIL Local Rule 7.1(D)(2)(b)(2). Copies of both of these Rules were sent to Plaintiff when the summary judgment was filed (See Doc. #44). Much of Plaintiff's response contains no citation to the record; it simply contains his argument. To the extent that the Court would have been obligated to scour the record looking for support where none was tendered by the Plaintiff, the Court has not done so.

Second, the Rules require that facts asserted by a party be capable of presentation in a form that would be admissible in evidence, and that affidavits and declarations be based on personal knowledge, based on admissible facts, from an affiant or declarant competent to testify about the matters contained therein. FRCP 56(c)(2), (4). Many of the documents Plaintiff has presented contain his own comments and handwriting on them, and he relies on these comments,

despite the lack of personal knowledge or admissible evidence cited to support his comments. In fact, many of his comments are simply his characterizations of evidence, which is argument, not evidence. Many of the documents appear to be his own compilations of evidence that he has gleaned from various original sources, but his only identification of those original sources is "Defendant's own documents" or something equally vague. These summaries are not admissible without evidentiary support.

Many of the facts Plaintiff designates as "disputed" are not truly "disputed", because Plaintiff simply states that he disagrees with them, without providing any evidentiary support for his disagreement. Similarly, Plaintiff asserts additional and purportedly "undisputed" facts which contain no citation whatsoever to any evidence. Specifically, his response to the following paragraphs of Defendant's statement of fact indicates that he disputes them, but nothing in the record is cited to support that position (See 1, 6, 11, 13, 18, 20, 21, 22, 34, 37, 38, 39). Of the 62 additional material facts he asserts, 37 of them contain no citation to the record at all (See, 1, 2, 3, 5, 6, 7, 8, 9, 11, 15, 17-35, 43, 44, 50, 53, 54, 55, 56, 61).

The failure to comply with the Federal and Local Rules carries with it ramifications. The Federal Rule explains that failure to properly support or address a fact allows the Court to, inter alia, consider the fact undisputed, or grant summary judgment if the motion satisfies the legal requirements of Rule 56. See, *Salvadori v. Franklin Sch. Dist.*, 293 F3d 989, 992 (7th Cir.2002); *Hedrich v. Bd. of Regents of Univ. of Wis. Sys.*, 274 F3d 1174, 1178 (7th Cir.2001); *Waldridge v. American Hoechst Corp.*, 24 F3d 918, 922 (7th Cir.1994); *Ziliak v. AstraZeneca LP*, 324 F3d 518, 520 (7th Cir.2003). The Seventh Circuit has repeatedly approved strict enforcement of local rules, holding that obligations thereunder are not mere formalities See, *Waldridge v American*

*Hoechst Corp.*, 24 F3d 918, 922 (7th Cir 1994) (collecting cases); *Delapaz v Richardson*, 634 F3d 895 (7th Cir 2011).

That said, the following statement of facts is taken largely from the Defendant's Statement of Undisputed Material Facts, with additions where appropriate from Plaintiff's responsive Statement.

In 1990, Olajide Giwa was hired by the City of Peoria as an Urban Planner in the City's Planning and Growth Management Department ("the Department"). His pre-hire interviews were conducted by Wayne Anthony, the Director of the Department, and the Assistant Director, Patricia Landes. Both of them participated in the decision to hire Giwa. Landes was impressed by Giwa's preparedness, and she recommended his hire.

Giwa is an African-American born in Nigeria in 1956. Landes is Caucasian and about 14 years older than Giwa. On a very few occasions, Giwa and Landes socialized outside the workplace; their relationship was primarily professional.

In 2000, ten years after his hire, Giwa was promoted from Urban Planner to Senior Urban Planner. There are technical requirements for holding the higher position - a master's degree and four to five years' experience as an urban planner is required - but the primary difference is that a Senior Urban Planner works with minimal supervision on larger and more complex projects and produces a higher quality of product.

Between 2000 and 2003, Giwa was evaluated annually by Wayne Anthony. The evaluation forms used by the City require ratings in 7 general areas of job performance. Each one is rated as "Above Standards", "Meets Standards", or "Below Standards". For each rating, there is also a Comment/Rationale section in which the evaluator justifies the rating that was given. At the end, the evaluator gives an "Overall" rating, using the same three standards. Wayne

12

Anthony's evaluations of Giwa for these years rated Giwa "Meets Standards" in all 7 areas as well as Overall. In his comments, Anthony noted that Giwa possessed "general knowledge" of departmental duties outside his area of expertise and a "high degree of initiative" within his area of expertise. No details or further explanation was given.

Until 2003, Urban and Senior Urban Planners usually were assigned to a particular task or specialty area for years. Giwa's exclusive responsibility until 2003 centered on computer-generated mapping (GIS) and other projects related to census data collection. During 2003, however, the City was forced by budget constraints to reduce its urban planning staff. Two urban planner positions as well as some support staff were lost. Thereafter, all Planners in the Department were required to cross train, and assignments among the Urban Planners and Senior Urban Planners were rotated more frequently.

In 2004, Wayne Anthony retired and Patricia Landes was promoted to replace him. As Giwa's supervisor, Landes evaluated his performance annually. In 2004, she met with Giwa to discuss her first draft of her evaluation of him. Following that meeting, she revised her evaluation form. The final version of that evaluation showed that he "Meets Standards" in all 7 areas and overall. That did not mean, however, that the evaluation lacked criticism. The evaluation read as follows:

Knowledge:  Knowledge of job duties, other than computer mapping, are [sic] appropriate for an Urban Planner, but not a Senior Planner. Needs to have more in-depth knowledge of the department operations related to planning and zoning and serve as a resource to more junior staff. Lack of knowledge does not foster confidence in others."

Quantity:  Meets deadlines and completes fair share of assigned work.

Quality:  Solid record keeping for projects, excellent quality for mapping, continues to need improvement in quality and clarity of written communications. Is very careful in the performance of duties.

Work Ethics:  Very dedicated to work and takes great pride in work. Has good time management skills and makes noticeable effort to contribute to the objectives of the department.

13

Conformance to Procedures/Regulations:     Observance of Working Hours
Conforms to standards for observance of working hours.

Initiative/problem solving:    Skilled in the operation of technology in the department, would like to see more initiative regarding identification of new opportunities to use technology to increase service. Also, as Senior Planner needs to [sic] more assertive in solving problems and being resourceful.

Customer Service/Relationships
Works well on team as participant, needs more experience as team leader. Has patience in dealing with customers.

Giwa prepared an extensive written response to his evaluation, disputing Landes' criticisms. Landes responded that, while she appreciated his comments, she would not be changing the evaluation. Giwa received a merit pay increase.

Again in 2005, Landes prepared Giwa's evaluation. Her rating in the category of "Knowledge" dropped to "Below Standards." All other categories remained "Meets Standards," as did his Overall rating. Many of Landes' comments remained unchanged from 2004. Where there were changes, they were as follows:

Knowledge:    Jide has generally received acceptable levels of ranking on this factor due to knowledge and use of computer software related to GIS. However, that component of his work is minimal in nature. The majority of his work is with administration of the Zoning Ordinance through counter and commission work. Within the department, both with Urban and Senior Planners, he has the least amount of knowledge and understanding of the ordinance. He needs to have more in-depth knowledge of the ordinance and department operations related to planning and zoning, and serve as a resource to more junior staff. Lack of knowledge does not foster confidence in others.

Customer Service/Relationships:     Works well on team as participant, needs more experience as team leader. Has patience in dealing with customers but has difficulty in explaining zoning regulations to them.

Again, he responded in writing to the evaluation, disputing the negative comments. The evaluation was not changed. Once again, he received a merit pay increase.

In 2006, Giwa's job performance was subjected to criticism and discipline. Landes had issued him a verbal reprimand on February 21, 2006 for deficient job performance, specifically for lack of quality, timeliness, and failure to follow directions regarding a particular assignment. Her criticism also went to his lack of timeliness on Historic Preservation cases and his failure to manage work contracted out by the City for graphic art services. Her meeting with Giwa was also attended by the Assistant Director of the Department, Ross Black, and union representatives Rosilie Walker and Rachel Cook.

A written reprimand, issued on February 27, 2006, followed a meeting on February 24. The reprimand identified several problems that had arisen. First, he had failed to comply with Landes' directive that he forward to her all emails sent to the Department that Giwa opened, reviewed and responded to. The purpose was so that she could evaluate the number and complexity of these emails so that she could determine the impact that this particular duty might be having on his ability to complete his other assignments. She found that he had been untruthful in reporting that he received and responded to 15-20 emails per day, when he actually received an average of one per day. He was also cited for failing to respond within 24 hours to a City Council member's inquiry into a zoning complaint. She offered Giwa time off to "de-stress" and recommended that he use professional services to help with stress management. She also told him that the Human Resources Department was looking for a time management class for him to attend. Giwa did not mention any belief that his age, race or national origin factored into this decision. He instead acknowledged that he had exercised "wrong judgment." Landes told him that a written reprimand was the second step in progressive discipline and that he needed to improve his job performance to avoid further discipline, including possible termination.

On March 30, 2006, Giwa was given a one-day suspension for deficient job performance, specifically for his error in issuing a zoning permit for a garage that was larger than allowed by the zoning ordinance. His error was brought to a City Council member's attention by a constituent, reflecting poorly on the Department and causing additional work for the Department. At the March 28 meeting when this error was discussed, Giwa did not mention any belief that discrimination was at the root of the discipline. He acknowledged making an error. Landes explained how serious the error was and noted that this was a third step in discipline and that further problems could result in further discipline, including termination.

The October 2006 evaluation of Giwa reflects these multiple disciplinary actions: Landes rated him "Below Standards" in Knowledge, Quality of Work, Conformance to Procedures/Regulations; his overall rating was also lowered to "Below Standards". Her comments on the evaluation form were as follows:

Knowledge:    Continues to have a lesser level of knowledge related to job duties in the position of Senior Planner. Lack of knowledge or lack of application of knowledge resulted in a suspension during the rating period.

Quantity:    Contributes fair share of assigned work, but quality and knowledge issues preclude assignment of more complex work related to Senior status.

Quality:    Quality of work is not reflective of a Senior Urban Planner with 15 years' experience. Received verbal reprimand for inadequate writing and lack of management of contract for services. Also received suspension for issuing a very simple zoning certificate in error. Has been provided extra training for writing skills, but does not produce the level of writing needed from the Senior Urban Planner position. Does however continue good record keeping and care with work.

Work ethics:    Continues with pride in work and dedication in achieving goals of department. Jide tries harder than anyone in the department to be successful.

Conformance to Procedures/Regulations;
Untimely processing of Historic Preservation cases contributed to a verbal reprimand.

Initiative/Problem Solving
Have seen improvement in leadership, needs to continue to focus on problem solving.

Customer Service/Relationships

> Continues to work well on teams, have patience with customers, and needs improvement in verbal communication.

The October 2006 evaluation resulted in an agreement between Landes and Giwa for a follow-up review on January 19, 2007. At that time, they agreed to review the "Below Standards" items to see if Giwa's performance had improved and whether the "Below Standards" ratings could be amended upward. If so and if there were less than 3 "Below Standards" remaining, a pay increase would be considered.

There were 4 items on the list for the January review. The first item involved accuracy in work product. Giwa was required to submit to Landes every Friday copies of his entire work product from the week. In addition to reviewing that work for accuracy, Landes would review it for compliance with standard business use of language, grammar and ease of understanding. His ability to meet deadlines would also be reviewed, and he was required to have no further disciplinary actions during the period.

On November 15, 2006, Landes gave Giwa a 3 day suspension for conduct unbecoming a City employee and unprofessional behavior during an interaction with a citizen of the City. The citizen had complained to the City that Giwa had waved his arms, screamed and yelled accusations, and called the citizen a liar and a manipulator. After the complaint was made, Landes spoke with two people who had been present during the event as well as the citizen who complained (who signed an affidavit as to what had happened) and Giwa himself. She concluded that Giwa's version of the events was not credible. At the November 6 meeting, she recommended that Giwa seek counseling for anger and stress management. He did not complain about discrimination.

In the January 6, 2006 evaluation, Landes upgraded several of the "Below Standards" to "Meets Standards;" Knowledge, however, remained "Below Standards." Her evaluation read:

Knowledge:    Continues to have a lesser level of knowledge related to job duties in the position of Senior Planner.

Quantity:    Continues to meet deadlines and complete fair share of work.

Quality:    Continues good record keeping and care with work. Continues toc need to improve on writing skills. Note; Improvement on multiple tickets outside of time period.

Work Ethics:    Continues with pride in work and dedication to achieving goals of department.

Conformance to Procedures/Regulations;
    Continues to meet standards

Initiative/Problem Solving
    Have seen improvement in leadership, needs to continue to focus on problem solving.

Customer Service/Relationships
    Continues to work well on teams, have patience with customers, and need improvement in verbal communication.

Her overall rating of Giwa improved to Meets Standards. At the top of the evaluation form, she added in all capital letters the following, "NOTE THAT ALL COMMENTS ARE FOR PERFORMANCE DURING THE EVALUATION PERIOD ONLY!".

On March 20, 2007, the garage at Giwa's home was vandalized with racial graffiti. Landes allowed City employees to take time off work to clean off the graffiti.

Giwa was again evaluated on August 29, 2007. He received "Below Standards" ratings for Knowledge, Quality, Initiative/Problem Solving and Customer Service/Relationships, as well as an overall rating of Below Standards. His evaluation read:

Knowledge:    Continues to have a lesser level of knowledge related to job duties in the position of Senior Planner, and an inability to accurately interpret and administer the zoning ordinance, both of which contribute to providing inaccurate answers to customers, either verbally, in written documents, or as part of a plan review. Does not seem to be able to identify the specific question/issue to be addressed, and then identify or formulate the steps necessary to successfully address the issue. Examples include inability to fill out Work Plan for HPC, lack of understanding on assignments regarding certificates of occupancy, and analysis of variance requests in HOP area.

Quantity:    Contributes fair share of assigned work, but quality and knowledge issues preclude assignment of more complex work related to Senior status and takes him more time to complete a task than others. An example would be the issue of being asked whether or not a methadone clinic was allowed at

|  | a particular site, an exercise that took nearly four hours to complete and should have taken approximately 20 minutes. |

Quality:    Quality of work is not reflective of a Senior Urban Planner with 15 years' experience. Writing skills are poor, files are improperly documented, and end product of work [verbal or written] is often incorrect in an environment where the public has reliance on our development approvals to expend significant resources. Inaccuracies include giving wrong information on timing of sign changes, issuing zoning certificate without checking for parking, providing wrong answer on the methadone issue noted above, not measuring accurately for a variance, incorrectly identifying the number of units in affidavit related to 114 NE Roanoke, approving a storage shed in a front yard, not fulling [sic] investigating whether a guest house was included in an application, not fully documenting or processing a complaint about the removal of a tree in a historic preservation district, and processing of certificate of occupancy for liquor/grocery store on Adams Street.

Work Ethics:    Jide ranks high in this area with the dictionary definition of work ethic; i.e., a belief in work as a moral good and if the factor would also include effort or commitment. However, he ranks lower with our guidelines, particularly for deficiencies in being able to work with little supervision, attention to detail, and contributing to the objectives of the department.

Conformance to Procedures/Regulations

Conforms to all attendance issues; needs increased knowledge and application of regulations and policies related to land development ordinances.

Initiative/Problem Solving

Is having difficulty in problem solving, primarily not understanding the problem to solve and the steps to implement to solve the problem. Has to be told in great detail how to go about project. Example would be the recent assignment for Certificates of Occupancy [C/O] in which he had to identify the cases that were backlogged [lacking a sign off from PGM] for issuance of the C/O, note the reason for not having a sign off, inspect, and then take corrective action. Well into the process he had not looked at the stack of files in Inspections that were the backlog to find out very easily what the problems were. In another critical assignment for the office to analyze variances to determine if the new code would still require the requests to be processed as a variance, we met many times to go over the assignment, the purpose, and the process. Each time there was a clear lack of understanding of the purpose. During the 3rd or 4th time of receiving a report that was not addressing the purpose, Jide stated that he did not know that the purpose was to determine the impact of the new code on variances and whether or not additional code changes were needed...even though he used that language in the beginning of his report.

Landes stated in her Overall Comments:

19

Coaching, changing job assignments, offering training, and strongly recommending counseling have not improved the performance to be of the caliber expected of a Senior Urban Planner with 15 years' experience at the City of Peoria. I am not able to rely on the accuracy of work product generated. During the last evaluation there was agreement that if performance improved there would be a retroactive pay increase; that did not happen. This is the second annual revue with a below standard rating. A final performance improvement plan will be drafted within the next week to cover the next 60 days, and failure to raise ratings could result in termination.

Giwa signed the evaluation, writing next to his signature, "I do not agree with this review."

About a month after this evaluation, on September 19, 2007, Giwa was given a five-day suspension for deficient job performance. Although the suspension was based in part on Giwa's disciplinary history, the specific incident that triggered the suspension was Giwa's involvement in a zoning inspection of a proposed site for a controversial liquor store. Giwa had originally stated that the site was in compliance with the City's Zoning Code, when a follow up inspection showed that the site was not in compliance. Once the problem was identified, Giwa did nothing to communicate the existence of a problem to Landes; she learned of it from another Planner. After consultation with Giwa's union representative, this discipline was imposed.

On December 21, 2007, Giwa filed a charge of discrimination with the EEOC., alleging discrimination based on race, national origin and age, as well as retaliation.

On February 22, 2008, Landes noticed a check on Giwa's desk dated December 14, 2007. By City policy, checks payable to the City are to be deposited within 48 hours. Landes directed Giwa to deposit the check. He did not do so until March 4, 2008 because he was working on other things.

The Peoria City Council's agenda for its February 26, 2008, meeting included a request from the Central Illinois Landmarks Foundation that all demolitions in the City be pre-approved by the historic preservation commission. Giwa had authored a Department recommendation as to

this request. Landes expected Giwa to be at the City Council meeting, based on a department policy requiring that anyone who writes a City Counsel communication attend the City Council meeting to make presentations, answer questions, or explain the communication. Landes expected Giwa to attend the meeting but he did not. The next day, he explained that he had forgotten to tell her that the matter would be deferred. According to Landes, normally when a matter is deferred the Department head confers with the city manager to determine if there is other appropriate action that can be taken instead of or in addition to deferral. Because Landes did not do so, it made her look bad with the city manager and caused her professional embarrassment.

In February of 2008, Landes gave Giwa an assignment that involved obtaining information about fees that were charged for various types of projects and preparing a chart for the City Manager. It took Giwa 10 days to produce a completed project, and it contained numerous (according to Landes, 24) factual errors. Nearly all of the information Giwa needed for this chart was available within the Department.

On March 6, 2008, Landes terminated Giwa's employment, stating as her grounds unsatisfactory conduct/performance, failure to follow a department procedural directive, lack of timely communication to a supervisor concerning the status of an item pending before the City Council, failure to follow municipal policy about checks, and negligence in preparation of an official document for the City Manager. The two-year history of discipline was also cited.

Giwa grieved that termination, and the union represented him in the arbitration proceedings. Nearly three years after his termination, the City and the Union entered into a settlement agreement that was approved by the arbitrator. Pursuant to this agreement, the City reinstated Giwa to his position on February 14, 2011, subject to a 6 month Performance Plan that

laid out the responsibilities of the City and of Giwa. There was a relatively small financial amount paid to Giwa as well.

Between 2004 and 2008, Landes issued a total of 25 disciplinary measures as to employees in her Department. Six of those were the disciplinary measures against Giwa that were discussed above. The other 19 were against other employees in the Department, with discipline ranging from verbal and written reprimands to suspensions ranging from one day to 30 days, not to mention (despite Giwa's statement to the contrary) one other termination. Handwritten notes on the Chart indicate that the employees involved in 12 of the disciplinary actions were younger than Giwa and Caucasian; 4 were older and African American, 2 were younger and African American, and 1 was older and Caucasian.

Giwa asserts that the ways Landes treated him and evaluated him "were clearly motived" (Response p.26) by his race, national origin, and/or age and in retaliation for his disagreement with her evaluations of him. In support of that proposition, he cites to parts of the record that show his disagreement with her evaluations (Exh. A and Arb. Tr.), his accomplishments in the department (Exh. B), his version of the events leading up to his 3 day suspension (Exh. C); and unsworn "testimonies" of two persons about the problems between Landes and Giwa. (Exh. Z). There is nothing in any of these exhibits that references directly or obliquely his race, national origin or age.

Giwa also asserts (without any citation to evidence in the record) that, after his termination, Landes reassigned to younger, Caucasian Urban Planners (Leah Allison and Josh Naven) his computer and census data analysis duties. It appears from other parts of the record, however, that this reassignment occurred while Giwa was still employed, and that this may have been part of the re-allocation of job duties that occurred as a result of the budget cuts in 2004.

22

Giwa compares Landes' negative evaluations of him not only with the positive evaluations he received from her predecessor but also with the positive evaluations Landes gave to other Planners in the Department. He summarizes his criticisms of Landes' reviews by stating that his "laudable accomplishments" were never recognized in his reviews, while his faults were "always promptly noted in disproportionately damaging ways." (Response p.13).

Plaintiff raises a number of other complaints about Landes. For example, he complains that she was 'snobbish" and "hostile" towards him. He complains that despite his objections during the 1990's, she hired Ross Black as her Assistant Director, even though he was not qualified for that position.

One piece of evidence to which Giwa does cite is the testimony of Rosilee Walker during the arbitration hearing (Exh. LL). Walker was a union grievance steward who had been involved in a number of grievance proceedings with Giwa. She testified at the arbitration hearing in November of 2010 that Landes had been very condescending to Giwa and that she had called him a liar during one of those hearings. In addition, she related overhearing a particular statement made by Landes during 2005. Giwa had been on a trip to Nigeria. On his return, he was talking about his trip, and Walker testified that she overheard Landes say that Giwa "needed to go back and help his people." (Plaintiff's Exh. LL, p.179-80).

V DISCRIMINATION CLAIMS

A Introduction

There is no question that, beginning when she became Director of the Department, Pat Landes was critical of Giwa's performance. She gave him progressively negative evaluations - often worse than those she gave anyone else in the Department. She doled out discipline on numerous occasions. She reassigned his computer mapping duties, duties that he had worked

23

very hard to learn and that he had performed well for years. She treated him with some level of impatience, perhaps even hostility. Ultimately she terminated his employment.

This Court, however, does not sit in judgment of the wisdom or correctness of her decisions or of the interpersonal relationship between Giwa and Landes. Unless, that is, they were motivated by discriminatory intent. In his complaint, Giwa asserts that Landes was motivated by bias against him on the basis of age, race and national origin discrimination; he also alleges that she retaliated against him.

The City's motion for summary judgment asserts that there is insufficient evidence to support Giwa's claim that Landes was motivated by improper intent or that she retaliated, regardless of whether Giwa is proceeding under the direct or the indirect method of proof. Giwa, who is proceeding pro se in this matter, has responded to the motion.

B Direct method

Beginning with Giwa's claim that he was subjected to materially adverse employment actions on the basis of his race, age or national origin, the City first asserts that his claim fails under the direct method, because he has no evidence - direct or circumstantial - that Giwa's age, race or national origin was a motivating factor for anything that happened to him.

That assertion is certainly correct as to Giwa's claim of discrimination on the basis of age and race. There is absolutely nothing in the record that references either characteristic directly, and there is nothing in the record from which such discriminatory intent might be inferred. Landes disciplined employees regardless of race or age. There is no pattern evident from her disciplinary history. Job duties were reassigned within the Department due to budget cuts - a fact that Giwa has not rebutted in any way - and the fact that some of his duties went to younger or

Caucasian employees is, without more, simply immaterial. The duties of everyone in the Department were shuffled, and cross training was expected, regardless of race or age.

Giwa has, however, tendered one piece of direct evidence in support of his claim of discrimination on the basis of national origin, namely Landes' June 2005 statement overheard by Rosilee Walker. However insensitive that remark was, it was made in a context wholly unrelated to any employment-related decision. It was also temporally unrelated to any adverse employment action. In other words, considering that the first actual discipline - a verbal reprimand - of Giwa was not imposed until February of 2006, a statement such as the one reported by Rosilee Walker was too removed in time and in context to reveal anything of significance in this litigation.

Landes' statement need not simply be considered in isolation, however; it can and should also be considered along with the circumstantial evidence that has been presented. See, *Nagle*, 554 F3d 1106, 1114-15 (7th Cir 2009); *Paz v Wauconda Healthcare & Rehabilitation Center, LLC*, 464 F3d 659, 666 (7th Cir 2006); *Sylvester v SOS Children's Villages Illinois, Inc.,* 453 F3d 900, 903 (7th Cir 2006). The direct and circumstantial evidence together must "suggest[] discrimination through a longer chain of inferences." *Atanus v Perry*, 520 F3d 662, 671 (7th Cir 2008).

The circumstantial evidence of discrimination that Giwa has put forward includes his evaluations, the reassignment of his computer-related duties, and the pattern of what he characterizes as disproportionate or unwarranted discipline. Beginning with his negative evaluations, Giwa asserts that they reveal Landes' hostility towards him. With one possible exception, discussed below, these negative evaluations reveal absolutely nothing about discriminatory bias.

25

What the evaluations reveal is a department head's dressing down of an employee who is not performing his job at the level she expected. Giwa has pointed to nothing that might lead to a conclusion that discrimination played a part in Landes' thought processes. It may be true that Landes' predecessor perceived Giwa as doing a satisfactory job. That, however, simply means that, while his prior supervisor may have been satisfied, Landes was not. In fact, Landes' evaluations were based on a different work environment. Giwa had, beginning in 2004, different job duties than he had had under Wayne Anthony. While he may well have been exceptionally talented at the GIS-related job duties, those duties were deemed "minimal" by Landes, and he was cautioned to broaden the depth and breadth of his knowledge. As the Seventh Circuit has held, prior evaluations do not create issues of fact when there have been "substantial alterations in the employee's responsibilities" in the interim. *Peele v Country Mutual Insurance Co.,* 288 F3d 319, 329 (7th Cir 2002). While he maintains that he had the requisite knowledge of the Zoning Ordinance, for example, his repeated errors belie that assertion, or at least demonstrate that he was unable to apply his knowledge, a comment made by Landes in one of the evaluations.

Giwa also posits that his evaluations not only contained "disproportionate" criticisms of his faults, but also failed to include any praise for his achievements. This, he claims, is different than the evaluations she gave to other Planners and Senior Planners. The comparisons lack any significance. Some Planners received "Below Standards" just as Giwa did. Others received "Meets Standards" as he did. Moreover, the evaluations of the other Planners often contained criticisms of shortcomings and directions in areas requiring improvement. That Landes saw more to praise in some of the other Planners and more to criticize in Giwa is not significant.

Giwa's reliance on his evaluations is based entirely on his belief that she misapprehended the underlying facts or that she failed to appreciate his contributions. If Landes, however, honestly believed certain facts, it matters not whether that version of the facts was correct or whether the employment action that resulted from those facts was wise, because this Court is not to sit in review of the action as some sort of "super-personnel department" but rather only reviews the actions of the employer to ascertain whether the actions violated Title VII. *Stewart v Henderson*, 207 F3d 374, 378 (7th Cir 2000); *Nawrot v CPC International,* 277 F3d 896 (7th Cir 2002); *EEOC v Armstrong World Ind.,* 185 F Supp 2d 932, 937 (CD Ill 2002). Here, Giwa has presented no evidence at all to counter Landes' affidavit that sets forth her understanding of the facts on which she based her conclusion that Giwa was under-performing as a Senior Urban Planner or that he made mistakes that deserved a lower rating. The evaluations are not evidence of either race or age discrimination.

The one possible exception to that conclusion, referred to above, is Landes' criticism of Giwa's written and oral language skills. At first blush, it might seem possible that this criticism arose from her attitude about his national origin, but that perception does not hold up on examination. Giwa's job responsibilities prior to the budget cuts in 2004 were primarily computer related; it was only after budget cuts (which roughly coincided temporally with Anthony's retirement and Landes' promotion) that any shortcomings in Giwa's language skills would have impacted his job performance. His ability to communicate orally only became crucial when he began having regular interactions at the Department's public counter with citizens who came to the Department, or when he began having responsibilities related to Code enforcement that required communication with property owners during and after inspections. Similarly, prior to the budget cuts, he had not been required to serve on commissions and provide

27

1:09-cv-01306-JAG   # 51   Page 28 of 35

oral and written information to City Council members. While his language shortcomings may have been due to the fact that English was not his first language, which does not mean that requiring him to address those shortcomings was motivated by discriminatory intent.

Giwa also argues that taking away his computer-related duties and reassigning those duties to "younger, Caucasian" Planners was evidence of age and race discrimination. There are two problems with this argument. First, this occurred at a time when all Planners were having their duties shuffled to cover the budget cuts. To infer discrimination in this case from that fact would be to speculate. Second, not everything that makes an employee unhappy is discriminatory. *Nagle*, 554 F3d at 1115-16. Reassignment to what an employee subjectively perceives as "less desirable" duties does not constitute differential treatment or amount to an adverse employment action. Id. at 1117.

I conclude that Giwa has failed to present any circumstantial evidence whatsoever of discriminatory intent to supplement that single piece of direct evidence - Landes' statement from June of 2005. The Seventh Circuit has made it clear that a few insensitive remarks are not sufficient to raise an inference of discrimination. See, for example, *Blasdel v Northwestern University*, - F3d -, Case No. 11-2075, 2012 WL 2927763, July 19, 2012 (7th Cir)(a "handful of stray remarks" insufficient); *Nichols v Southern Illinois University-Edwardsville*, 510 F3d 772, 781-82 (7th Cir 2007)("stray remarks" unrelated to employment decision at issue insufficient); *Merillat v Metal Spinners Inc*., 470 F3d 685, 694 (7th Cir 2006)("isolated comments" insufficient). In this case, there is only one remark; if multiple remarks are insufficient; a single remark is even less notable.

No reasonable jury could infer that Landes made her decisions about Giwa based on any hostility towards his race, age or national origin. There is simply too much other documentation -

largely undisputed - that reveals errors, lapses in judgment, failures to comply with rules and policies, and other faults in Giwa's job performance. The "scintilla of evidence" put forward by Giwa is insufficient to defeat summary judgment on his discrimination claims. No fact finder could reasonably conclude that Landes was more likely than not motivated by a discriminatory purpose.

C Indirect Method

The City also argues that Giwa cannot establish a prima facie case of discrimination using the McDonnell Douglas analysis. There are four elements to a prima facie case of discrimination, one of which is evidence that the plaintiff was meeting the employer's legitimate performance expectations. The City asserts first that Plaintiff has no evidence that his performance rose to that level. In *Peele*, 288 F3d 319, the record contained evidence of repeated warnings by the employer that the plaintiff's job performance was unacceptable. She received nine critical written evaluations informing her of the specific deficiencies in her performance, but she filed to correct them. The Court of Appeals commented that this evidence of "deteriorating job performance" was "overwhelming. Id. at 328. In addition, the Court pointed out that the issue of performance is not past performance but rather performance at the time of termination. Id. at 329. Finally, the Court declined to find that co-worker statements indicating that the plaintiff's job performance was satisfactory were insufficient to create a factual dispute as to this issue. Id.

As in Peele, Giwa's evidence that he was performing his job duties adequately is not enough to create a factual dispute as to this issue. His supervisor documented his inadequate and declining performance. His evaluations repeatedly cautioned him about his areas of weakness. Rather than taking positive steps to improve, he repeatedly disagreed with her conclusions. Her criticisms were perfectly legitimate areas for comment by a supervisor, having to do with matters

such as timeliness, compliance with Department policies and rules, completion of assignments and the like.

For the most part, Giwa does not deny his errors, untimeliness, failure to follow regulations or complete assignments, and the other facts underlying his negative evaluations and disciplines; he simply tries to explain them away. While some of his co-workers undoubtedly thought highly of him, their statements about his job performance carry no weight on this issue.

*Peele* also makes clear that even legitimate expectations can be applied in a discriminatory fashion. Id. For example, if there is evidence that the employer applied those expectations to Caucasian or younger employees in a more favorable manner, that is also a violation of Title VII. In that case, the McDonnell Douglas factors merge, and the analysis proceeds directly to pretext. Id. The Court explained that this requires identifying someone who is directly comparable to the plaintiff in all material respects, looking at factors pertinent to the individual case. Id. at 330.

Here, those factors would be the disciplinary records and the evaluation standards. With respect to the disciplinary claim - the claim that plaintiff was disciplined more harshly than younger Caucasians - a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

Id., quoting *Radue v Kimberly-Clark Corp.,* 219 F3d 12, 617-18 (7th Cir 2000).

Giwa has not made such a showing. Although he provides the discipline chart, he not only fails to give any details about who these people are - are they Planners? Support staff? - Or

what the discipline was for. In fact, he expressly denies (with no explanation) that they are comparable to him.

A similar result is reached for the evaluations, although for different reasons. Giwa has submitted several other Planners' evaluations. Some of them, it is true, are glowing. Others, however, are not. Those that are not contain similar criticisms about job performance as did Giwa's own evaluations. He provides no information about which Planner is what race or what age. Moreover, Landes made it clear that she was holding him to the standards applicable to his position - Senior Urban Planner with 15-18 years of experience - so comparing his performance or his reviews with less senior Urban Planners would not be a meaningful comparison. Altogether, a comparison of Giwa's evaluations to those of the other Planners in the Department does not reveal any discriminatory application of the ratings standards.

Finally, because the bulk of Giwa's evidence and argument consists of his own opinions about his performance, that issue should be confronted. His own opinion about how he did the job is "beside the point," Luks v Baxter Healthcare Corp., 467 F.3d 1049, 1055 (7th Cir. 2006), and while he may have created factual disputes about some of the events leading up to the various criticisms of his performance, those disputes are not material, because the relevant question is whether Landes honestly believed the facts to be as they were stated in the documents she created. Nothing Giwa has tendered to the Court calls into question her honesty in the slightest.

Whether it is because Giwa's evidence falls far short on the issue of his job performance or because he has no evidence of pretext, he has failed to rebut the City's motion for summary judgment as to discrimination.

D Retaliation

31

The City's motion does not address Giwa's claim that he was subjected to retaliation in violation of Title VII. The Court sua sponte considers this claim in light of the apparent problems of proof discussed above.

Under *Stone v Indianapolis*, 281 F3d 640 (7th Cir 2002), as clarified by *Sylvester v SOS Children's Villages of Illinois*, 453 F3d 900, 8902 (7th Cir 2006), there are two analytically distinct ways for a plaintiff to proceed in a retaliation claim. As was true for the discrimination claims, these two distinct methods are the direct method of proof and the indirect method of proof.

The indirect method requires the plaintiff to show that after engaging in protected activity only he, and not any similarly situated employee who did not engage in protected activity, was subjected to an adverse employment action, even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents un-rebutted evidence of a non-invidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial. *Stone*, 281 F3d at 644.

It is apparent from the outset that Giwa's evidence in support of the indirect McDonnell Douglas analysis fails for the same reason that it failed in his discrimination claims: he simply cannot show that he was performing his job in a satisfactory manner, and he cannot show pretext. See, for example, *Nicholson v Pulte Homes Corp*., Case No. 11-2238, 2012 WL 3217620 *7, Aug. 9, 2012 (7th Cir)(FMLA). A more detailed analysis is not necessary; the evidence and its shortcomings are identical to what was discussed above.

Proceeding to the direct method of proving retaliation, such claims must be supported by evidence that the plaintiff engaged in protected activity and as a result suffered the adverse

employment action of which he complains. *Sylvester*, 453 F3d at 902. Here, there is no evidence that Giwa engaged in any actionable protected conduct by mentioning discrimination, age, race or national origin to Landes (or anyone above her) until he filed the EEO charge on December 21, 2007. (See Amended Complaint (Doc. #13)). Hence, nothing Landes did before that date can be considered retaliatory.

Giwa filed his EEO charge, which was clearly protected activity, about 2 ½ months before his termination on March 6, 2008. The Seventh Circuit has repeatedly held that even relatively short gaps between protected activity and an adverse job action cannot, without more, support a claim of retaliation. See, *Jones v A.W. Holdings LLC*, Case No. 11-2403, 2012 WL 2337351, *5, June 20, 2102 (7th Cir)(two months); *Turner v The Saloon, Ltd*., 595 F3d 679, 690 (7th Cir 2010) (two months); *Argyropoulos v City of Alton*, 539 F3d 724, 734 (7th Cir 2008) (seven weeks); *Tomanovich v City of Indianapolis*, 457 F3d 656, 665 (7th Cir 2006) (two months); *EEOC v Yellow Freight System, Inc.,* 253 F3d 943, 952–53 (7th Cir 2001) (en banc) (six weeks). The timing of Landes' action of terminating Giwa's employment is not enough, without more, to establish the requisite causal connection between that act and the filing of his charge.

Here, there is no more. The history of Giwa's slipping job performance and the need for repeated discipline led inexorably to Landes' action. Each time he was disciplined, he was cautioned that this was a step in progressive discipline that could lead to further discipline; eventually those cautions included the warning that his continued employment was at risk. Yet in February of 2008 he violated three different Department policies, and made numerous factual errors in a report that had been requested by the City Manager - Landes' boss. Although he complained about these policies and the job assignment, he had no justification for his conduct.

33

At the time, he was on a performance improvement plan. In light of this history, the questionable temporal proximity falls far short.

Most of what Giwa has described in his complaint and in his response to the pending motion is not retaliation at all. The types of "retaliation" that he complains about is retaliation for complaining about his negative evaluations or his discipline or having his duties re-assigned. Such conduct is not actionable protected activity. See, *Wojtanek v Pactiv LLC*, Case No. 12-1801, 2012 WL 3554026 *3, Aug. 20, 2012 (7th Cir). Retaliation as a cause of action must be based on protected activity, such as complaining about discrimination or threatening to file a charge of discrimination.

## VI CONCLUSION

This discussion began with the comment that Landes had been critical of Giwa's performance almost from the day she began in her position as Director of the Department. But Landes had been in that Department for some time before she was promoted to that position, predating Giwa's hire into the Department. At the time Giwa was hired, Landes had had a good opinion of him and had in fact recommended that he be hired, surely reflecting no predisposition of bias. Her opinion of Giwa changed as they worked together, and it continued to worsen as he refused to make the improvements that she, as his supervisor, required him to make. These improvements directly related to his job performance, and her criticisms of his deficiencies reflected standards to which she held other Senior Urban Planners as well. Her very first evaluation of him contained the germs of every subsequent evaluation, and those subsequent evaluations reflected the shortcomings in his job performance that had resulted in discipline.

Giwa's evidence shows little more than an employee disgruntled because his job duties were changing. It is only in hindsight that he has asserted any form of discrimination or

retaliation, and his efforts to show that the discipline imposed on him was disproportionate or unfair or retaliatory are to no avail. The City's motion for summary judgment is therefore granted as to the discrimination claims, and the Court sua sponte grants summary judgment as to the retaliation claim. Clerk is directed to enter judgment in favor of Defendants and against the Plaintiff. This case is terminated.

ENTERED:  January 7, 2013

s/ John A. Gorman
JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE